UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                   :

ARTFUL DODGERS IN PERFORMANCE LLC and   :
THEATRE FOR A NEW AUDIENCE,               :     Case No. 15 Civ. 4456
                                                 :

                          Plaintiffs,        :

                       - against -        :     **JURY TRIAL**
                                            :     **DEMANDED**

BEN LATHAM-JONES and LONDINIUM FILMS LTD.,  :

                     Defendants.     :

                                                 :
------------------------------------------------------------------------X

## COMPLAINT

        Plaintiffs Artful Dodgers In Performance LLC ("Artful Dodgers") and Theatre

For A New Audience ("TFANA") (collectively, "Plaintiffs") by their undersigned counsel,

Cleary Gottlieb Steen & Hamilton LLP, as and for their Complaint against Ben Latham-Jones

and Londinium Films Ltd. (collectively, "Defendants") allege as follows, on knowledge as to

themselves and their own acts and on information and belief as to all other matters except as

indicated otherwise:

## BACKGROUND AND SUMMARY OF ACTION

        1.     This is a complaint for breach of contract and fraud based on Defendants'

failure to honor the unambiguous requirements of their contract with Artful Dodgers and

Defendants' subsequent knowing misrepresentations calculated to induce Plaintiffs to forebear

from suing Defendants and instead to negotiate over a new agreement, which Defendants have

demonstrated they have no intention to complete.

        2.     TFANA and renowned director Julie Taymor collaborated in December

2013 and January 2014 in a stage production of the Shakespeare play *A Midsummer Night's*

*Dream* (the "Stage Production").  After Ms. Taymor expressed an interest in creating a motion picture capturing the Stage Production (the "Film"), Defendant Ben Latham-Jones expressed interest in producing such Film, through his production company, Defendant Londinium Films Ltd.

3.      On December 31, 2013, the Defendants entered into a contract (the "Contract") with Artful Dodgers, the for-profit affiliate of TFANA, setting forth the rights and obligations of Artful Dodgers and Defendants, and the benefits accruing to TFANA, in respect of the Film.  A true and correct copy of the Contract is attached hereto as Exhibit A.

4.      The Contract obliged the Defendants to "furnish or raise 100% of the capital required for the production" and to indemnify Artful Dodgers and TFANA against all claims and liabilities arising out of the production of the Film.  The Contract further granted TFANA the right to receive 10% of the net profits of the Film.

5.      Despite Defendants' unambiguous funding and indemnity obligations under the Contract, and despite Plaintiffs' repeated efforts to secure reimbursement, Defendants left Plaintiffs to bear substantial out-of-pocket costs required for the production of the Film, including administrative expenses, employee wages, and licensing fees.

6.      At the same time, Defendants failed to supply other necessary capital, forcing Ms. Taymor to provide hundreds of thousands of dollars of funding to ensure completion of production of the Film and mitigate damages.

7.      In the spring of 2015, with production complete and in order to enable successful distribution of the Film, Plaintiffs and Ms. Taymor approached Defendants to negotiate a new agreement that would resolve Defendants' substantial unpaid obligations and clearly establish all parties' rights in the Film.  Plaintiffs, Ms. Taymor, and their respective

counsel worked extensively over the course of months to craft a new agreement acceptable to Defendants, under which, among other things, they would accept less than total reimbursement from Defendants for their existing expenses.  In May 2015, all parties agreed to a final form of the new agreement (the "Proposed New Agreement"), with signatures to be held in escrow until the payment due to Plaintiffs thereunder.  A true and correct copy of the Proposed New Agreement is attached hereto as Exhibit B.

8.     At the same time, Ms. Taymor and her advisors negotiated various additional agreements necessary for release of the Film, including distribution agreements, assumption agreements related to certain union contracts, and a collection account agreement to govern distribution of proceeds from the Film.

9.     Recently, all prerequisites to release and distribution appeared to be in place, and the Film was scheduled to premiere in New York on June 15, 2015, and in London on June 18, 2015, and to have further commercial distribution beginning on June 22, 2015.

10.     Such premieres and distribution will give rise to additional union dues for which Plaintiffs are directly liable.  In order to cover such expenses – and to cover Plaintiffs' existing unrecouped expenses – Defendants agreed to pay TFANA $200,000 upon execution of, and in order to complete closing of, the Proposed New Agreement.  To date, and again despite repeated requests from Plaintiffs, Defendants have not provided the agreed-upon funding and have instead become impossible to reach.

11.     Having thus induced Plaintiffs to continue dealing with them and to forebear from acting on their rights under the Contract until such time as the premieres and distribution of the Film became practically unstoppable, Defendants have now effectively disappeared, doubtless hoping to enjoy the fruits of distribution while withholding payment to

Plaintiffs until such time – if ever – Defendants choose to honor their obligations.  All the while, Plaintiffs are subject to demands from their own contractual counterparties including the stage unions whose work was necessary to make the Film, and whose fees Defendants are obligated to cover under the Contract.

12.     In short, by failing their obligations to Plaintiffs under the Contract and then misrepresenting their intent to enter into and perform under the Proposed New Agreement, Defendants have caused, and continue to cause, substantial damage to Plaintiffs.

## THE PARTIES

13.     Plaintiff Artful Dodgers is a domestic limited liability company incorporated in New York, New York, on June 28, 2011, with its principal place of business at 154 Christopher Street, New York, New York 10014.  Artful Dodgers is the for-profit affiliate of TFANA.

14.     Plaintiff TFANA is a not-for-profit 501(c)(3) organization located in Brooklyn, New York and dedicated to developing and vitalizing the performance and study of Shakespeare and classic drama.  Its theatre is located at 262 Ashland Place, Brooklyn, New York 11217.

15.     Defendant Ben-Latham Jones is a citizen and resident of the United Kingdom.

16.     Defendant Londinium Films Ltd. is a company incorporated in the United Kingdom on April 24, 2012, with its address listed as Hanover House, 14 Hanover Square, W1S 1HP, London, United Kingdom.

4

## JURISDICTION

17.     The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), in that this is a civil action with an amount in controversy exceeding $75,000, exclusive of interest and costs, between citizens of the State of New York and citizens of a foreign state.

18.     Venue is proper in this Court pursuant to the express agreement of the parties in the contract, and pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claim occurred in New York.

## FACTS

19.     TFANA is a professional theatre dedicated to the performance and study of Shakespeare and classic drama.  TFANA is led by its Creative Director and Founder, Jeffrey Horowitz.  Director Julie Taymor collaborated with TFANA in 2013 in directing the Stage Production of *A Midsummer Night's Dream*, which opened in November 2013.

20.     In late November 2013, Ms. Taymor expressed an interest in making the Film – a motion picture capture of the Stage Production.  In order to help secure a producer, Ms. Taymor introduced TFANA to her agent, Jeffrey S. Berg, and to Lynn Hendee, a film producer.

21.     By mid-December, Berg mentioned that Defendant Ben Latham-Jones, a producer and the founder of Ealing Studios, had seen the play and was interested in producing the Film, including putting up all the money that was required to do so.

22.     Defendant Latham-Jones then stated that he did not have time to set up a production company to produce the Film.  Instead, he asked that TFANA be the paymaster and promised that he would indemnify TFANA for all of its costs.  TFANA, as a non-profit, could not act as such a paymaster.  However, Artful Dodgers, its for-profit affiliate, could fulfill this role.

23.     Plaintiffs' attorney, Richard Ticktin, asked Defendant Latham-Jones how Artful Dodgers and TFANA could be guaranteed they would be indemnified for any production costs they incurred.  Defendant Latham-Jones said he would sign "anything" and would wire $500,000 to Artful Dodgers as an upfront payment.

24.     On December 29, 2013, Defendant Latham-Jones sent an email to Ticktin (the "December 29 Email") in which he warranted and represented that "Londinium Films LTD will indemnify Artful Dodgers in Performance, LLC/TFANA from any action taken on behalf of the [*Midsummer Night's Dream*] Film at [Defendants'] request.  This includes all SAG/AFTRA and DGA signatory obligations as well as other necessary employment and vendor agreements contracted by Artful Dodgers and dictated by the exigencies of production."[1]  A true and correct copy of the December 29 Email is attached hereto as Exhibit C.

25.     Pursuant to this initial email agreement, Artful Dodgers formally entered into the Contract with Defendants Latham-Jones and Londinium on December 31, 2013.  Under the Contract, Defendants "have sole responsibility to furnish or raise 100% of the capital required for the production."  Defendants also agreed to indemnify Artful Dodgers and TFANA against "any claims, losses liabilities, damages, penalties, costs and expenses (including reasonable attorneys [*sic*] fees and disbursements), arising out of or resulting from the production of the Film."

26.     The Contract also recited that Defendants had previously transferred $500,000 to Artful Dodgers and authorized Artful Dodgers to disburse those funds pursuant to a protocol established by agreement dated December 29, 2013, between Jeffrey Horowitz (Artistic

---

[1]     SAG/AFTRA is the merged union comprising the Screen Actors Guild and the American Federation of Radio and Television Artists; DGA is the Directors Guild of America.

Director of TFANA and Manager of Artful Dodgers) and Lynn Hendee.  A true and correct copy
of the protocol is attached hereto as Exhibit D.

27.     However, the Film cost far more than $500,000 to produce – in fact, more
than twice as much.  Defendants were well aware of the need for additional funds.  At one point,
Defendant Latham-Jones purported to arrange a wire transfer of an additional $500,000 to Artful
Dodgers but then stated a "security hold" had been put on the transfer, without any explanation
of who had allegedly exercised this hold, for what reason, or how this transfer was in any way
different from the successful transfer of the initial $500,000.

28.     Ms. Taymor then provided $300,000 to Artful Dodgers to allow Artful
Dodgers to meet accumulated payroll obligations.  *See* Letter from Jeffrey Horowitz to JPM
Chase Bank, N.A., dated February 10, 2014, a true and correct copy of which is attached hereto
as Exhibit E.  Thereafter, Ms. Taymor provided additional funding for the Film, which has so far
cost in excess of $1,000,000 to produce, with certain expenses still accruing.

29.     Notwithstanding the contributions from Ms. Taymor, Plaintiffs were
forced to bear substantial costs related to the production of the Film for which they have not
received any reimbursement or funding, including but not limited to the following:

30.     *Payments to creative artists pursuant to union licensing contracts.*
Plaintiffs, as producers of the Stage Production, entered into licensing agreements with the
designers, directors, choreographers and actors who created the Stage Production. These
agreements, made through the creative artists' unions (Actors Equity Association ("AEA"),
United Scenic Artists ("USA"), and Stage Directors and Choreographers Society ("SDC," and
together with AEA and USA, the "Theatrical Unions")), obligate Plaintiffs to make (a) upfront
payments ("Accrued Union Obligations") and (b) additional payments to the artists whenever the

7

Film is displayed on a new "platform," *i.e.*, means of distribution or viewing (such additional

payments, the "Future Union Obligations").  *See, e.g.,* Agreement between TFANA and United

Scenic Artists, dated January 9, 2014, a true and correct copy of which is attached hereto as

Exhibit F.

      31.    *Administrative expenses and losses.*  Plaintiffs incurred additional

expenses and losses during the production.  In particular, TFANA lost seat income when

production equipment made seats unavailable; incurred additional utility fees; incurred

accounting fees; and contributed substantial staff time (delivered at a discount to Defendants)

(such losses and expenses, "Direct Costs").

      32.    *Legal fees and expenses.*  Plaintiffs incurred and continue to incur legal

fees and expenses relating to the production of the Film, including but not limited to expenses

and fees associated with the various agreements to which Artful Dodgers and TFANA became

parties and expenses and fees associated with attempts to secure the promised funding from

Defendants.

      33.    Under the plain terms of the Contract, Defendants were obligated to

provide funding to cover all of these expenses and are now obligated to indemnify Plaintiffs for

the same.

      34.    Plaintiffs made repeated attempts to obtain from Defendants the funds

necessary to cover their accrued expenses related to the Film.  *See, e.g.,* Letter from Richard

Ticktin to Ben Latham-Jones dated September 17, 2014, a true and correct copy of which is

attached hereto as Exhibit G.  In response, Defendant Latham-Jones was alternately combative

and elusive, by turns denying any obligation, admitting some obligation, and disappearing

purportedly to deal with various emergencies of family and friends.

8

35.     Nevertheless, in an effort to enable release and distribution of the Film, Plaintiffs worked extensively with Ms. Taymor and her advisors to draft a revised agreement setting forth all parties' continuing rights and obligations relating to the Film.  After numerous drafts containing serial revisions to accommodate Defendants' concerns, all parties agreed on the Proposed New Agreement.  The Proposed New Agreement would have fixed Defendants' further funding obligations at $200,000 – an amount less than Defendants' true obligations – to be paid to Plaintiffs to cover, among other things, Plaintiffs' roughly $170,000 in Accrued and Future Union Obligations and over $20,000 in Direct Costs borne by Plaintiffs.

36.     In order to protect against Defendants' failure to immediately provide the $200,000 funding, Plaintiffs requested a closing for simultaneous exchange of signatures and payment.  Ultimately, for Defendants' convenience, Plaintiffs agreed to forego a physical closing and to accept that all signatures would be escrowed until Defendants wired the $200,000 to TFANA.  On information and belief, all signatures were executed on or about May 19, 2015.

37.     Despite the completion of negotiations and signing, in escrow, of the Proposed New Agreement, and despite the obvious importance of immediate payment, Defendants did not then wire the money.  Despite repeated requests from Plaintiffs, Defendants did not wire the money later in May, nor early in June, nor last week.  Despite Plaintiffs' notice to Defendants that Plaintiffs would initiate this lawsuit if payment was not received promptly on Monday, June 8, Defendants did not wire the money on June 8, nor did they initiate a transfer today, June 9, 2015.

38.     Moreover, despite never sending the money in order to complete the closing, Defendants took all other steps to achieve the benefit of the Proposed New Agreement. In particular, Defendants executed a licensing agreement for worldwide distribution of the Film

(exclusive of the United States), a licensing right Defendants do not and cannot have until the Proposed New Agreement becomes effective upon closing by payment to Plaintiffs. Defendants also acquiesced in United States licensing as provided in the Proposed New Agreement. And Defendants executed a collection agreement setting forth the "waterfall" structure that will deliver Defendants a 39.5% profit share from all distribution.

39.     The Film is scheduled to premiere in New York on June 15, 2015, and in London on June 18, 2015, and will have further commercial showings in New York on June 22, 2015.

40.     Such premieres and commercial showings will immediately give rise to substantial Future Union Obligations that would have been covered by the Proposed New Agreement and presently remain the Defendants' obligations under the Contract. Further commercial distribution will give rise to the remainder of the Future Union Obligations.

41.     In other words, Defendants have proven themselves fully capable of timely completing agreements that will cause the Film to be displayed and distributed – and to generate returns for Defendants – but inexcusably unwilling to pay for it. Defendants apparently plan to reap the benefit of the Proposed New Agreement and to incur the costs – namely payment to Plaintiffs – only when and to the extent they choose.

42.     Given Defendants' breaches of the Contract and their disappearance until a new and favorable deal was offered to them, it can only reasonably be concluded that Defendants have no intention of keeping the promise they made to Plaintiffs that induced Plaintiffs to forebear from suit and sign the Proposed New Agreement. Instead, Defendants have every intention of dishonoring the obligations they would have had under the Proposed New Agreement just as fully as they did their obligations under the Contract, hoping to exchange this

10

new promise for an even better deal down the road – which next deal they will again seek to trade for another, and so on, until such fraud is stopped.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

43.    Plaintiffs repeat and reallege each and every allegation in Paragraphs 1 through 42 as if fully set forth herein.

44.    Pursuant to Paragraphs 1 and 3 of the Contract, Defendants were obliged to "furnish or raise 100% of the capital required for the production" of the Film and to indemnify Plaintiffs against "any claims, losses, liabilities, damages, penalties, costs and expenses (including reasonably attorneys [*sic*] fees and disbursements), arising out of or resulting from the production of the Film."

45.    Defendants have breached the Contract by failing to furnish the capital required for production of the Film and by failing to indemnify Plaintiffs for their expenses related to production of the Film.

46.    Defendants have exacerbated the aforementioned breach by making additional promises to Plaintiffs to induce them to allow further exploitation of the Film in a manner that will cause accrual of Future Union Obligations that Defendants are also obligated to indemnify under the Contract.

47.    As a result of Defendants' breach of the Contract, Plaintiffs have been damaged in an amount of not less than $200,000.

## SECOND CAUSE OF ACTION

### (Fraud)

48.     Plaintiffs repeat and reallege each and every allegation in Paragraphs 1 through 47 as if fully set forth herein.

49.     In the Contract, Defendants made the material representation and promise and undertook the contractual obligation that they would supply all necessary capital for production of the Film and would indemnify Plaintiffs for all costs.  In the Proposed New Agreement Defendants made the material representation and promise that they would pay Plaintiffs $200,000 simultaneously with signing of the New Agreement.  At the time they made these representations and promises and undertook these obligations, Defendants knew they had no intention to perform unless it proved convenient for them to do so.

50.     Defendants did not supply all necessary capital, have not indemnified Plaintiffs for all costs, and have not paid Plaintiffs $200,000.  Defendants' promises and representations were false.

51.     Defendants knew at all times that their representations were false.  As Defendants' conduct to date demonstrates, Defendants serially misrepresent their intentions in order to secure benefits – and then seek to renegotiate their false promises.

52.     Plaintiffs relied on Defendants' knowingly false and material representations, which induced Plaintiffs to enter into the Contract and later induced Plaintiffs to forebear from suit and to permit steps that are certain to give rise to further liabilities.

53.     As a result of such fraud, Plaintiffs have been damaged in an amount not less than $200,000.

12

## PRAYER FOR RELIEF

For these reasons,  Plaintiffs requests an order and judgment:

(a) finding Defendants breached the Contract and committed fraud;

(b) ordering Defendants to immediately pay to Plaintiffs $200,000 plus interest thereon;

(d) ordering Defendants to pay Plaintiffs' attorneys' fees and other costs of this action;

(e) ordering Defendants to pay post-judgment interest as allowed by law; and

(f) granting all other relief, in law and in equity, which this Court deems just and proper.

Dated: New York, New York
   June 9, 2015

Respectfully submitted,

CLEARY, GOTTLIEB, STEEN & HAMILTON

By: /s/ Jonathan I. Blackman
   Jonathan I. Blackman

One Liberty Plaza
New York, New York  10006
(212) 225-2000

*Attorneys for Plaintiffs Theatre for a New Audience and Artful Dodgers*

13

**<u>Exhibit A</u>**

**ARTFUL DODGERS IN PERFORMANCE LLC**
c/o Theatre For A New Audience
154 Christopher Street, Suite 3D
New York, New York 10014

As of December 31, 2013

Mr. Ben Latham-Jones
Londinium Films Ltd.
Ealing Green
London W5 5EP
England

Re:   **A Midsummer Night's Dream**

Gentlemen:

This letter, when countersigned by you, will constitute the agreement by and among Artful Dodgers In Performance LLC (AD"), on the one hand, and, on the other, Ben Latham-Jones and Londinium Films Ltd. (collectively, the "Producers") regarding the motion picture production of the stage production of *A Midsummer Night's Dream* currently being presented by Theatre For A New Audience ("TFANA") in New York City (the "Film").   Our agreement is as follows:

1.   Producers, jointly and severally, shall have sole responsibility to furnish or raise 100% of the capital required for the production of the Film, including any overages and items not included in the current budget for the Film other than certain direct costs that AD or TFANA have agreed to absorb.

2.   The parties acknowledge that Londinium Films Ltd. has previously transferred to the account of AD the sum of $500,000 and that AD may disburse funds from such account in furtherance of the production of the Film in accordance with the so-called "Memorandum of Agreement on Transfer of Production Funds" dated December 29, 2013 between AD and Lynn Hendee on behalf of a production company to be named (the "Production Funds Memo").

{00655957.DOC;2 }

3.     Producers, jointly and severally, hereby indemnify and hold harmless AD, TFANA and their officers, directors, managers, employees, agents and representatives (the "Indemnified Parties") from and against any claims, losses, liabilities, damages, penalties, costs and expenses (including reasonable attorneys fees and disbursements), arising out of or resulting from the production of the Film, other than, with respect to the Indemnified Parties severally and not jointly, matters arising out of the gross negligence or willful misconduct of the Indemnified Parties.

4.     In consideration of its agreement to allow the Film to be made and its cooperation in the making thereof, TFANA shall be entitled to receive an amount equal to 10% of 100% of the net profits of the Film at such time as net profits are distributed to Producers and any other persons entitled thereto. "Net profits" shall be defined as customary in the motion picture industry, but in no event less favorable than the definition in Producers' agreement with Julie Taymor.

5.     In further consideration of this Agreement and the rights granted by TFANA, AD and TFANA shall each receive such credit in the opening credits and closing credits of the Film as the parties shall determine, in good faith.

6.     This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to principles of conflicts of law. Any suit involving any dispute arising under this Agreement may only be brought in the U.S. District Court for the Southern District of New York or the Supreme Court of the State of New York, County of New York, and the parties hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, administrators, executors, successors and assigns. Notwithstanding the foregoing, no party may assign his or its rights or obligations under this Agreement without the prior written consent of the other parties, such consent not to be unreasonably withheld, delayed or conditioned, and any purported assignment without such consent shall be void.

This Agreement, together with the Production Funds Memo, constitutes the entire agreement between us with respect to the production of the Film. No changes to either document may be made orally.

If the foregoing correctly reflects your understanding of our agreement, please sign below and return a copy to the undersigned.  This Agreement may be executed in any number of counterparts and by each of the parties in separate counterparts, including execution by telefacsimile or "pdf" transmission, and each counterpart when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Sincerely yours,

ARTFUL DODGERS IN
PEFORMANCE LLC

By: _____
    Jeffrey Horowitz, Manager

READ AND AGREED:

_____
BEN LATHAM-JONES

LONDINIUM FILMS LTD.

By: _____
    Ben Latham-Jones, President

**<u>Exhibit B</u>**

# MEMORANDUM OF AGREEMENT

The following Memorandum of Agreement ("**Agreement**") dated as of April 21, 2015 sets forth the terms among Londinium Films LTD. ("**Investor**"), LOH, Inc. ("**Owner**") and Artful Dodgers in Performance LLC ("**Artful Dodgers**") in connection with the financing, production and exploitation of the motion picture version of William Shakespeare's "A Midsummer Night's Dream" ("**Picture**") based on the stage adaptation ("**Play**") presented by Theatre for a New Audience ("**TFANA**").

WHEREAS, the parties acknowledge that TFANA owns the copyrights in the Play of which the Picture is an authorized derivative work;

WHEREAS, reference is made to that certain Letter dated as of December 31, 2013 between Investor and Artful Dodgers, as may have been amended from time to time, regarding the motion picture production of the Play (collectively, "**Prior Agreements**"); and

WHEREAS, the parties hereto desire to amend and restate the Prior Agreements in their entirety to formalize and affirm their respective rights and obligations with respect to the Picture and to add Owner as a party.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner, Investor and Artful Dodgers hereby agree as follows:

1.      Investment: Investor has heretofore provided finance for the production of the Picture in the sum of $1,200,000 ("**Investor Investment**") which was insufficient to complete the Picture and Owner has heretofore provided additional finance for the finishing costs of the Picture in the sum of $204,403.17 ("**Owner Investment**"). Upon the Closing (as defined below) of the investment contemplated by this Agreement, Investor shall provide to Artful Dodgers, for retention or disbursement to the relevant third party, additional finance in the sum of $200,000 ("**Accrued Additional Financing**") to defray sums advanced by Artful Dodgers, union/guild costs and other outstanding costs in connection with the Picture as follows: (a) reimbursement of foregoing payments pursuant to and final buy-out of remaining obligations under agreements with AEA, USA and SDC totaling $169,587.60; (b) reimbursement of direct costs of Artful Dodgers and TFANA, including employee wages, accounting fees, additional overhead and seat kill losses up to $20,350.25 (the final amount payable for such direct costs being the balance remaining of the $200,000 referred to above after all other costs referred to in (a) to (h) inclusive have been paid); (c) underpaid fringes per the DGA audit of $2,757.76 (increasing to $3,418.55 if not paid by 27 April 2015); (d) estimated additional fees due to DGA if film budget exceeds category threshold, estimated at $3,000; (e) errors & omissions insurance costs estimated at $5,000; (f) outstanding invoice from TIFF for a hard-drive of $259; (g) $2,500 due Greg Emetez for behind-the-scenes footage; and (h) Berlin Film Festival costs due Goldcrest of approximately $2,000. In the event that, upon final accounting, the sum of all costs and expenses set forth in items (a) through (h) above is less than $200,000, then Artful Dodgers shall return the difference to Investor.  Investor shall as promptly as reasonably practicable after the date hereof, arrange for the establishment of the collection account referred to in paragraph 6.c. below and shall pay all costs (including, without limitation, legal fees and expenses) in connection therewith on the full execution of the collection agreement (but Investor shall not be responsible for any other party's costs in connection with the negotiation and execution of the collection agreement). In order to facilitate the distribution and exploitation of the Picture throughout the world, Investor shall make available to Owner, promptly following the full execution of this Agreement and to the extent the same have been made available to Investor, copies of all production cost statements and other chain of title documentation customarily required by distributors of motion pictures.

2.      Closing: Subject to the terms and conditions of the Agreement, the transfer of Accrued Additional Financing contemplated hereby shall take place simultaneously with the execution of this Agreement at a closing ("**Closing**") to be held at such time and place and in such manner as shall be mutually agreed to by the parties hereto. At the Closing, Investor shall deliver to Artful Dodgers the Accrued Additional Financing, by wire transfer to an account to be specified by Artful Dodgers, which Artful Dodgers undertakes to use solely to defray the sums specified in paragraph 1 above.  On Artful Dodgers' receipt of such moneys, TFANA and Artful Dodgers shall release any and all security interests they may have in respect of the Picture.

3.      Ownership: Investor and Owner hereby agree that Owner (through a newly established limited liability company to be formed by Owner) shall own, solely and exclusively, on a worldwide basis, the entire copyright (and all extensions and renewals of copyright) in and to the Picture and all film, tape, databases and other physical materials embodying the same and/or created in connection therewith, subject to the grant to Investor of the distribution rights in the Picture referred to below. Owner shall grant to Investor a security interest over Owner's right, title and interest in and to the Picture to secure the Investor Investment and all other sums advanced by Investor in connection with the Picture which it is entitled to recoup. Investor's security interest shall be subordinate to the rights of distributors and licensees that distribute, exhibit, broadcast or otherwise exploit the Picture and shall terminate upon Investor's recoupment of the Investor Investment and all other sums advanced by Investor in connection with the Picture which it is entitled to recoup.

4.      International Sales/Distribution: Owner hereby grants to Investor the sole and exclusive right, for a period commencing on execution of this Agreement and continuing until seven (7) years after the complete delivery of the Picture to Omniverse Vision Limited ("Omniverse"), to arrange for the distribution and other exploitation of the Picture and all allied and ancillary rights therein throughout the universe in all media, whether now known or hereafter devised. Owner confirms its approval of Omniverse as global distributor for the Picture (save that Omniverse's rights in North America shall be limited to theatrical rights) on the basis that Omniverse shall deduct from its gross receipts from the exploitation of the Picture (net of sales and value added taxes) its costs and remit to the collection agent (a) seventy-five per cent (75%) of the balance of gross receipts derived from the United States and (b) seventy per cent (70%) of the balance of gross receipts derived from outside the United States. Omniverse shall be entitled to grant licences which extend up to five (5) years after the expiry of its appointment. Owner shall be entitled to approve the long form agreement between Investor and Omniverse (such approval not to be unreasonably withheld or delayed, and to be deemed to have been given if Owner shall not have communicated its objection to the draft agreement within three (3) business days of its receipt of the relevant draft). Owner shall be entitled to approve local distributors in major international territories and the key terms of the licenses to such local distributors (such approval not to be unreasonably withheld or delayed, and to be deemed to have been given if Owner shall not have communicated its objection to the relevant request within three (3) business days of its receipt of the relevant request).  If at the expiry of Omniverse's seven year term the Picture has not generated any net profits, the grant to Investor shall be extended by a further consecutive period of three (3) years and Owner shall have the right to approve any extension of Omniverse's seven year term or the entering into of a substitute sales/distribution arrangement with a third party (such approval not to be unreasonably withheld or delayed, and to be deemed to have been given if Owner shall not have communicated its objection to the draft agreement within three (3) business days of its receipt of the relevant draft agreement). If at the expiry of Omniverse's seven year term the Picture has generated net profits, Owner shall consult with Investor meaningfully and in good faith regarding the exploitation of the Picture thereafter.

5.      North American Sales/Distribution: Jeffrey S. Berg ("**JB**"), or any entity designated by him, shall be entitled to a commission equal to five percent (5%) of the gross receipts arising from the exploitation of the Picture in North America and actually received into the collection account for the Picture that is referred to in paragraph 6.c. below, such commission to be paid by Investor, save where

gross receipts are paid direct to the collection account, in which case the commission will be paid out of the collection account by the collection agent.

6. <u>Waterfall of Proceeds:</u>

a. "**Gross Proceeds**" shall mean one hundred percent (100%) of any and all revenues received from the sale, license, and/or exploitation of the Picture or any element thereof and all allied and ancillary rights therein including any proceeds of tax credits and/or subsidies, worldwide, in any and all markets and any and all media and platforms now known or hereafter devised, all of which sums shall be paid to the collection account for the Picture established with the approved collection agent.

b. Gross Proceeds shall be disbursed in accordance with the terms of a collection agreement to be entered into among the approved collection agent, Investor and Owner and in the following order: (1) to standard off-the-tops, including, but not limited to, collection agent fees and expenses, domestic and international sales fees and expenses, collection costs, taxes, guild residuals, etc.; (2) to Owner until recoupment of the Owner Investment; (3) to Investor until recoupment of the Investor Investment, the Accrued Additional Financing, a premium of 20% (twenty per cent) on the aggregate of (a) that part of the Investment that exceeds one million US dollars (US$1,000,000), (b) the Accrued Additional Financing and (c) any other sums advanced by Investor in connection with the Picture (including, without limitation, all costs paid by Investor in connection with the collection account unless recouped under (1) above); and thereafter (4) to net profits, which shall be divided as follows: 39.125% each to Owner and Investor, 10% to Artful Dodgers; 5% to Lynn Hendee; 5% to Elliot Goldenthal and an aggregate of 1.75% to various venders including Hudson Scenic, Prop & Spoon, World Stages and Aerialistic.

c. Investor and Owner shall engage a mutually approved third party collection agent (with Fintage being pre-approved) to service domestic and international receipts and to account to all participants directly. Investor and Owner shall be parties to and beneficiaries of the agreement governing the management of such collection account and shall have the right to receive payments and statements directly from the collection agent and customary audit rights against the collection agent thereunder.

7. <u>Creative Control:</u> Investor and Owner acknowledge that the Picture has been completed but, for the avoidance of doubt, Owner has and shall continue to have sole approval and control (business, creative, or otherwise) with respect to the Picture, including final cut worldwide in all media (subject to legal and censorship requirements).

8. <u>Individual Producers:</u>

a. Investor has furnished and shall continue to furnish the services of Ben Latham-Jones ("**BLJ**") and Owner has furnished and will continue to furnish the services of Lynn Hendee ("**LH**") who have acted as and shall continue to act as the individual producers of the Film.

b. The following credits shall be accorded to BLJ and LH:

i. <u>On Screen:</u> an individual producer credit in a single card with LH in front position in the main titles of the Picture, in a size no less favorable than that accorded any other producer or the director in the main titles.

ii. <u>Paid Ads:</u> subject to distributor and/or broadcaster standard exclusions and exceptions, BLJ and LH shall be accorded the same credit in the billing block portion of any paid advertising issued by or under the

direct control of Owner or the distributor of the Picture. Additionally, BLJ and LH shall be accorded credit in the billing block of excluded ads in which such credit is accorded to any individual producer of the Picture, in the same position and size as set forth above, except in nomination, award, or congratulatory ads naming only said honoree.

c.    BLJ and LH shall be named as additional insureds on the general liability and errors and omissions insurance policy in connection with the Picture, if any, during customary periods of production and distribution of the Picture, subject to the limitations, restrictions, and terms of said policy. They shall also each sign a certificate of results and proceeds in customary form.

9.    <u>Presentation Credits:</u> The following presentation credits shall appear in the main titles of the Picture and in the billing block of all paid advertising issued by or under the direct control of Owner or the distributor of the Picture:

Card One:        "Ealing Studios and Londinium Films Present"

Card Two:        in association with Theatre For A New Audience

Card Three:      "A Julie Taymor Production"

10.    <u>Director:</u> Investor and Owner hereby acknowledge and agree that Julie Taymor ("**JT**") has completed her services as the director of the Picture and been paid her fixed compensation in full in accordance with the budget of the Picture.

a.    <u>DGA:</u> Owner acknowledges that the Picture has been produced under the jurisdiction of the DGA.   Investor shall request Omniverse to execute appropriate assumption agreements to protect Owner and Artful Dodgers against any liability for obligations to the DGA in connection with the Picture, failing which Investor shall arrange for the collection agent to pay such DGA obligations out of the collection account. Notwithstanding the foregoing, the parties intend that guild residuals will be paid through the collection account unless assumed by distributors. Investor and Owner shall use all reasonable efforts to require all distributors to execute customary guild assumption agreements and to pay all guild residuals in respect of the Picture as required pursuant to the DGA Basic Agreement and any other guild agreement.

b.    <u>Credits:</u> JT shall be entitled to receive credit as director in the form of "Directed by Julie Taymor" in accordance with the DGA Basic Agreement and a possessory credit in the form of "A Julie Taymor Film", on screen, on all positive prints of the Picture, each on a separate card, such possessory credit above the title, in the main titles (or in the end titles if the main titles are at the end of the Picture) and in the billing block of all artwork and paid ads including so-called excluded ads other than nomination, award and/or congratulatory ads in which only the honoree is mentioned.

c.    Investor shall inform all distributors of the credit obligations contained herein and in paragraphs 8.b. and 9 above and shall use all reasonable efforts to bind each such distributor to comply therewith, provided however, that any failure to do so shall not be a breach of this Agreement.

     d.      JT will be named as an additional insured on the general liability and errors and omissions insurance policy in connection with the Picture, if any, during customary periods of production and distribution of the Picture, subject to the limitations, restrictions, and terms of said policy. JT shall also sign a certificate of results and proceeds in customary form.

11.    <u>No Equitable Relief:</u> In the event of a breach by any party to this Agreement, all parties shall be limited to remedy at law for damages, if any, and in no event shall either party be entitled to injunctive or other equitable relief. Without limiting the foregoing, in no event shall any party be entitled (or seek) to enjoin or otherwise interfere with the development, production, distribution, advertising, and/or other exploitation of any rights based upon the Picture.

12.    <u>Miscellaneous:</u> This Agreement does not constitute a joint venture or partnership between the parties of any kind. All rights, remedies, licenses, undertakings, obligations, covenants, privileges and other property granted herein shall be cumulative and any party may exercise or use any of them separately or in conjunction with any one or more of the others. If any provision of this Agreement as applied to any party or any circumstances shall be adjudged by a court to be void and unenforceable, such shall in no way affect any other provision of this Agreement. This Agreement may be executed in counterparts, all of which together shall constitute a single agreement. Executed copies transmitted by facsimile transmission or transmitted electronically in either Tagged Image Format Files (TIFF) or Portable Document Format (PDF) by one party to the other parties shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment. This Agreement shall be construed in accordance with the laws of the state of New York applicable to agreements that are executed and fully performed within said State. Furthermore, any action commenced in connection herewith shall be venued in the state of New York, and the parties expressly consent to the jurisdiction of the federal and state courts located in the state of New York. Any dispute or controversy between the parties arising out of or in connection with any term or provision of this Agreement, the subject matter hereof, or the interpretation or enforcement hereof, shall be submitted to final and binding arbitration administered by JAMS, or its successor, in accordance with the rules and procedures of JAMS then in effect. This Agreement contains the full and complete understanding and agreement between the parties with respect to the within subject matter, and supersedes all other agreements between the parties whether written or oral relating thereto, and may not be modified or amended except by written instrument executed by each of the parties hereto. Upon the Closing, BLJ shall be released from all obligations and liabilities under the Prior Agreements.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and year first above written.


**AGREED TO AND ACCEPTED:**


LONDINIUM FILMS LTD.


Printed Name: _____

Title:


LOH, INC.


Printed Name: _____

Title:


ARTFUL DODGERS IN PERFORMANCE LLC


Printed Name: _____

Title:

**Exhibit C**

**From**: Ben Latham-Jones [mailto:blj@ealingstudios.com]
**Sent**: Sunday, December 29, 2013 10:52 PM Coordinated Universal Time
**To**: Richard M. Ticktin
**Cc**: L H <hendeechartoff@cs.com>; tvonklug@tfana.org <tvonklug@tfana.org>; Roy A. Jacobs; JHorowitz@tfana.org <JHorowitz@tfana.org>; Julie Taymor <lohinc@mac.com>; jberg@resolution-ent.com <jberg@resolution-ent.com>
**Subject**: Londinium and TFANA

Dear Dick,

I understand that you require a memo of understanding between my company and TFANA/AD for the comfort of your Board.  As you know, my attorney will not be back at work until after the holidays so, in consideration of our mutual time constraints,  I have personally drafted the below for your comments and consideration:

I, Ben Latham-Jones of Londinium Films LTD do hereby warrant and represent that Londinium Films LTD will indemnify Artful Dodgers in Performance, LLC/TFANA from any action taken on behalf of the MSND Film at my request.  This includes all SAG/AFTRA and DGA signatory obligations as well as other necessary employment and vendor agreements contracted by AD and dictated by the exigencies of production.

Londinium further agrees that TFANA/AD will receive a post-recoupment net profit participation of 10% of 100% of the net profits arising from the commercial exploitation of the film.

I can promise you that Julie, Elliot, Lynn and I have nothing but respect for TFANA and Jeffrey Horowitz, and that we look forward to working together on this marvellous project.


Very Best

Ben Latham-Jones

Ealing Studios
Ealing Green
London W5 5EP

UK  +447412903767
blj@ealingstudios.com

Ealing Studios Enterprises Limited a company registered in England and Wales, company number 03935252. Registered office: Ealing Studios Ealing Green London W5 5EP Ealing Studios Operations Limited a company registered in England and Wales, company number 03902482. Registered office: Ealing Studios Ealing Green London W5 5EP

## Exhibit D

DT:    December 29, 2013
FR:    Lynn Hendee
TO:   Jeffrey Horowitz
CC:   Theresa Von Klug
       Molly McBride
RE:   Artful Dodgers in Performance LLC Production Account Agreement

Below is a Memo of Agreement on Transfer of Production Funds for A Midsummer Night's Dream, the Film, to:

Artful Dodgers in Performance LLC
c/o Theatre for a New Audience
154 Christopher St. Ste 3D
New York, NY 10013
JPM Chase Bank, NA
ABA 021000021
Acct # 784746620

Upon signature of this agreement, Jeffrey Horowitz, who we understand to be the sole signatory of the above referenced account, agrees to use this account strictly for the Production Funds of A Midsummer Night's Dream, the Film.

We request that upon her arrival in NYC on Tuesday, Jeffrey will make Molly McBride a signatory on the production account. Molly will have the authority to approve expenditures under $1,000 as long as they appear on the budget with an appropriate line item. Jeffrey is authorized to approve all expenditures above this amount requested by Molly McBride as long as they appear on the budget with an appropriate line item.

All requested expenditures that do not appear on the budget require the approval of Lynn Hendee.

If you are in agreement with this protocol, please sign below, and the production funds which are now in escrow in Los Angeles will be immediately wired to the above referenced Artful Dodgers in Performance LLC account.


Jeffrey Horowitz, Manager
Artful Dodgers in Performance LLC

December 29, 2013
Date


Lynn Hendee, Producer
MSND, the Film
(Production Company to be Named Later)

December 29, 2013
Date

**<u>Exhibit E</u>**

VIA Fax:   866-320-8097
           212-499-2716

February 10, 2014

JPM CHASE BANK, NA
1166 Sixth Avenue, 20th Floor
New York, NY  10036

Attn:  Joseph Aleffi, Vice President
       Judith A. Atwell, Client Services

Re:  Bank Account No. 784746620 (the "Account")

Dear Mr. Aleffi and Ms. Atwell,

In view of the urgency to pay certain invoices in connection with the production of
A MIDSUMMER NIGHT'S DREAM, and because we have been advised of a
temporary security hold on the incoming $500,000 wire transfer to the Account,
Julie Taymor has agreed to advance the sum of $300,000 from her own account
directly to Media Services to fulfill payroll obligations for invoices they are
currently holding.  In consideration of the foregoing and for other good and
valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the undersigned, being the sole signatory on the Account, hereby
irrevocably instructs you to hold the funds in the Account in terms of the wired
$500,000 when it arrives, so that no withdrawals can be made against that
amount, unless and until an authorization to do so, in whole or in part, has been
received by you via email from Ms. Taymor or Lynn Hendee.  Immediately upon
your receipt of such funds, you are hereby irrevocably instructed to notify Ms.
Taymor by email addressed to her representative, Jeff Berg at jberg@resolution-
ent.com, and promptly thereafter, to wire transfer the sum of $300,000 to such
account as may be designated to you by Mr. Berg so as to reimburse Ms.
Taymor for her advance.  In addition, upon instruction from Ms. Hendee ,Ms
Taymor is also to be reimbursed immediately from that $500,000 for any further
advances concerning time critical post-production needs, including but not
exclusively, a $16,000 payment to Goldcrest for post-production facilities.

Very truly yours.

_Jeffrey Horowitz, Manager_
Artful Dodgers in Performance, LLC

**<u>Exhibit F</u>**



# UNITED SCENIC ARTISTS
29 West 38th St, 15th Fl    NEW YORK, NY  10018

### RECORDING AND RELEASE LICENSE ADDENDUM - LORT

Pursuant to the terms and conditions of the undersigned designers; Es Devlin Scenic Designer; Constance Hoffman Costume Designer; Donald Holder Lighting Designer; Matt Tierney Sound Designer and Sven Ortel Projection Designer (collectively referred to as the "Designers") who are the designers of the Theater For A New Audience's LORT D production of "A MIDSUMMER NIGHT'S DREAM" (the "Play") original contracts with Theatre For A New Audience (the "Producer") for the design of Producer's LORT D production of the Play; and in satisfaction of the provisions of the Agreement by and between The League of Resident Theatres ("LORT") and United Scenic Artists, Local USA 829 IATSE (the "Union"), and in specific satisfaction of Article XXIV.I. of that Agreement, Producer intends to license to Londinium Films, Ltd. (the "Licensee") the right to capture and release the LORT D production of the Play. The undersigned Designers hereby exclusively and irrevocably grant to Producer, Licensee and the Union hereby approves, the right to capture the Play and for the use of the Designers' designs as part of such recording (the "Recording"), for worldwide release in all broadcast markets in all media now known or hereafter devised in perpetuity throughout the world, including but not limited to release in movie theatres and at film festivals in any and all electronic formats including but not limited to an HD Cinecast or theatrical release, Television Broadcast,and distribution through direct sales to the public of a digital video discs (DVDs), Blue-Ray, or other direct to the public sales including but not limited to streaming or platforms such as Netflix under the following terms, limitations and conditions:

The capture shall take place on or about January 7 through 14, 2014; the dates for release on any platform are currently unknown. As of the date of this agreement, Producer and Licensee have no distribution deal in place. Producer and Licensee shall notify the Union in writing if and when a distribution deal for such a release is in negotiation and the anticipated date of release. Full payment of all fees and benefits as described herein, shall be made prior to any such release.

All rights in and to the stage design as conceived by the Designers are and will remain, the sole and exclusive property of the Designers, subject to the terms of the contracts between the Designers and Producer. This agreement grants Producer no rights beyond those listed herein.

This Agreement requires no personal services of the Designers. Should any work be required to adapt the original design for the capture and release, the Designers shall be given the first opportunity to perform such work. It is the intent of Producer and Licensee to capture the Play as it exists on the stage and in the editing of the Recording, the designs, including but limited to the projections, will not be altered or used other than as seen on the stage. Should any such further usage of the projections be desired, it will require further negotiation and agreement with the individual Designer, which shall include compensation and benefits.

## I. PAYMENT

All compensation and benefits payable under this agreement shall be paid by certified check or wire transfer and will be deposited as a Bond with the Union in advance of the capture (currently scheduled for January 7, 2014). Funds shall be made payable to the ***United Scenic Artists Stock Bonding Account*** . Funds will be distributed to Designers and Benefit funds from the Bond, and United Scenic Artists takes full responsibility, once the Bond is received from Producer or Licensee, to make payment to the designers. The Union shall deduct 2% of Designers' compensation from all payments the Union makes to the Designers' hereunder, and their signatures on this Agreement shall so authorize.

## II. COMPENSATION:

As Compensation for the rights granted to Producer in this agreement, the Scenic, Costume, Lighting, Sound and Projection Designers shall each receive a Fee up to a total amount of Twenty Thousand Dollars ($20,000), to be paid as follows:

- $5,000 to be paid prior to the capture;
- $5,000 prior to the first release on any platform, which is inclusive of one of the five additional platform payments listed below;
- Additional platform payments due prior to any such release (but not to exceed a further payment of $10,000, i.e. an aggregate license fee of $20,000 for all rights):
  - $2,500 for release as an HD Cinecast;
  - $2,500 for a theatrical release (such as a motion picture is released);
  - $2500 to be paid prior to release of DVD or other direct to the public sales including but not limited to streaming or platforms such as Netflix;
  - $2500 to be paid prior to the first North American television release;
  - $2500 to be paid prior to any Foreign Television release.

The Union and/or the Designers hereunder shall have the right to audit Producer's and/or Licensee's financial books and records on the same terms and conditions as are provided to SAG/AFTRA and SDC Members.

## III. BENEFITS

To provide Pension & Welfare benefits as per the LORT USA Agreement (currently 20.5%). The full Benefits contribution shall be due and payable concurrently with all compensation and payments as per Articles I and II above.

## IV. GENERAL PROVISIONS

This Agreement is for the capture and release as described herein, of Producer's LORT D Production of A MIDSUMMER NIGHTS DREAM only.

Producer agrees that each and every provision contained in the Basic Agreement between United Scenic Artists Local 829 and the League of Resident Theatres shall be part of this agreement, as though set forth herein at length to the extent such provisions are consistent with this agreement; except as set forth herein. No provisions of said Basic Agreement may be in any way waived or modified without previously having obtained the written consent of the Union.

In addition, Producer and Union agree that each and every provision contained in the Designers' original contracts for the production of the Play shall remain in full force and effect and shall be part of this Agreement to the extent such provisions are consistent with this Agreement, as though set forth herein at length (except as set forth herein) and cannot be modified unless agreed to in advance and with the written consent of the Producer and the Union.

## V. CREDIT TERMS

The Designers shall each receive credit on the Recording with "Scenic Design" and "Costume Design" on one card and "Lighting Design," "Sound Design" and "Projection Design" on another card, in the same size as each other and among other credits being accorded to others who rendered services for the original Play. Producer and Licensee agree that if any one Designers' card is given Front Card placement the other shall be as well. The position of the Designers' credit in any "crawl" type format shall be essentially the same position as the Designers' credit appears on the title page of the program for Producer's live stage production.

In addition, the Designers will receive credit on the DVD packaging for the Recording if any other design credit is accorded thereon. If there is a booklet or insert inside the DVD case with photos from the production, the Designers will be credited as applicable, thereon. All other matters regarding credit shall be in Licensee's sole discretion.

## VI. *DISPUTE*

Any complaint, dispute, controversy or grievance arising between the Producer and the Designers or Union concerning the interpretation, operation, application or performance of the terms of this agreement, or any complaint, dispute, controversy, or grievance involving a claimed breach of any of the terms or conditions of this Agreement, which cannot be settled and resolved between the parties, shall be settled by Arbitration undertaken in accordance with the LORT/Union Agreement. The decision of the arbitrator shall not have the power to amend, modify, alter or subtract from this Agreement or any provision thereof. This agreement shall be governed by the laws of the State of New York.

**Accepted: Theatre For A New Audience**

By: Theresa Von Klug, General Manager

Date: 1-9-14

154 Christopher Street, Suite 3D
New York, NY  10014
212-229-2819
tvonklug@tfana.org

**Accepted: United Scenic Artists**

By: Carl Mulert, Business Representative

Date: 1-9-14

29 West 38th Street, 15th Flr
New York, NY 10018
212-581-0300
cmulert@usa829.org

**Accepted: Londinium Films, Ltd.**

By: Ben Latham-Jones

Date: 9.1.14

Address: EALING STUDIOS

EALING GREEN

LONDON   Zip   W5 5EP

Phone: +44 208 567 6655

Email: BLJ@ealingstudios.com

*signatures follow on next page*

Accepted and Agreed to:

**Es Davila**

Date: _10/1/2014_

Address: _c/o ANNETTE STONE_

_40 (HAGFORD) ST_

_LONDON_  Zip _NW1 6E8_

Phone: _44 207 724-6726_

Email: _annette @ annette-stone.com_

**Constance Hoffman**

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

**Donald Holder**

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

**Matt Tierney**

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

**Sven Ortel**

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

**Carl Mulert**

**Business Representative for Live Performance**

**United Scenic Artists, Local USA 829, IATSE**

**29 West 38th Street, 15th Floor**

**New York, NY  10018**

**P: <u>917-408-6156</u>**

**F: <u>212-977-2011</u>**

**E: <u>cmulert@usa829.org</u>**

Accepted and Agreed to:

| Es Devlin | | Constance Hoffman | |
|---|---|---|---|
| | | *Constance Hoffman* | |
| Date: _____ | | Date: __January 27, 2014__ | |
| Address: _____ | | Address: 38 Plaza Street East | |
| _____ | | #3B, Brooklyn, | |
| _____ Zip _____ | | NY  Zip 11238 | |
| Phone: _____ | | Phone: 917 749 8623 | |
| Email: _____ | | Email: curchin2@earthlink.net | |
| | | | |
| Donald Holder | | Matt Tierney | |
| | | | |
| Date: _____ | | Date: _____ | |
| Address: _____ | | Address: _____ | |
| _____ Zip _____ | | _____ Zip _____ | |
| Phone: _____ | | Phone: _____ | |
| Email: _____ | | Email: _____ | |
| | | | |
| Sven Ortel | | | |
| | | | |
| Date: _____ | | | |
| Address: _____ | | | |
| _____ Zip _____ | | | |
| Phone: _____ | | | |
| Email: _____ | | | |

Accepted and Agreed to:

Es Devlin

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

Donald Holder

_Held S. Hull_

Date: _JAN 9 2014_

Address: _17 W 20TH ST._

_6TH FLR_

_NYC NY_ Zip _10011_

Phone: _917 797 3468_

Email: _DHOLDERLIGHTING @ GMAIL.COM_

Sven Ortel

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

Constance Hoffman

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

Matt Tierney

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

Accepted and Agreed to:

Es Devlin

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____


Donald Holder

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____


Sven Ortel

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____


Constance Hoffman

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____


Matt Tierney

Date: JANUARY 10, 2014

Address:

c/o Summit Entertainment Group
10 Potter Hill Drive
Guilford, CT 06437
917.334.1212
tierney_matt@yahoo.com

Phone: _____

Email: _____

**Accepted and Agreed to:**

**Es Devlin**

_____

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

**Constance Hoffman**

_____

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

**Donald Holder**

_____

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

**Matt Tierney**

_____

Date: _____

Address: _____

_____

_____ Zip _____

Phone: _____

Email: _____

**Sven Ortel**

_~~Sven Ortel~~_

Date: 1/9/14

Address: 252 VANBRUNT ST
BROOKLYN, NY

Zip 11231

Phone: 646 508 7834

Email: SVEN@SVENORTEL, COM

**<u>Exhibit G</u>**

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

875 THIRD AVENUE

NEW YORK, NEW YORK 10022-0123

(212) 603-6300

FAX (212) 956-2164

September 17, 2014

212-603-6308
rmt@robinsonbrog.com

Via Email: blj@ealingstuidios.com
Mr. Ben Latham-Jones
Londinium Films Ltd.
Ealing Green
London W5 5EP
England

      Re:    *Midsummer Night's Dream*

Dear Ben Latham-Jones,

As you may recall, I was engaged by Theatre For a New Audience to represent its interest in connection with the filming of *Midsummer Night's Dream*.

I have been advised that there was a screening at the Toronto Film Festival. As you have been made aware that will trigger payments to designers, the director and choreographer whose work was captured in the film.

Repeated efforts by TFANA staff and others have failed, thus far, to have the requisite funds available for payment in TFANA's bank account. Wiring instructions are being sent immediately. If the funds have been wired, please provide tracking information.

What started as a pleasant and fruitful collaboration in bringing the *Dream* to the screen, has come to our making this demand on you, personally and Londinium Films, corporately:

1.    Immediately wire good funds to TFANA's account in US Dollars in the amount of $30,125, for United Scenic Artists on behalf of the Designers and $18,905.40 which will go to satisfy the Stage Directors and Choreographers Society required re-use payments for the Toronto Film Festival. There may be other payments to other guilds/unions, not yet identified or quantified.

2.    Confirm your ongoing commitment to hold TFANA and Artful Dodgers harmless from any and all liability that may result from your film production of *Midsummer Night's Dream*.

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

September 17, 2014
Page 2


        Your failure to abide by your commitments, thereby putting TFANA and Artful Dodgers in financial jeopardy, leaves the organizations with no alternative but to take all steps necessary to enforce the terms of their agreement with you, personally, and Londinium Films, corporately, and protect their interests.


                                        Very truly yours,

                                        Richard M. Ticktin


RMT:csw
ccs:    Jeffrey Horowitz (via email)
        Michael Page (via email)
        Henry Christensen (via email)
        Lynn Hendee (via email)
        Reno Antoniades, Esq. (via email)